# EPSTEIN SACKS PLLC

ATTORNEYS AT LAW

100 LAFAYETTE STREET - SUITE 502

NEW YORK, N.Y. 10013

(212) 684-1230

Fax (212) 571-5507

BENNETT M. EPSTEIN: (917) 653-7116
SARAH M. SACKS: (917) 566-6196

February 20, 2024

Hon. Lorna G. Schofield
United States District Judge
Southern District of New York
United States District Court
40 Foley Square
New York, NY 10007

Filed on ECF

Re: *United States v. Jahlil Ford*; 23 Cr. 107 (LGS)
Sentencing Submission

Dear Judge Schofield:

  We represent the defendant Jahlil Ford pursuant to the Criminal Justice Act. He is scheduled to be sentenced by the Court on March 11, 2024. We submit this letter, along with the competency evaluation of Bureau of Prisons' psychiatric expert Dr. Kristen Schramm and the psychological evaluation of defense expert, Dr. Cheryl Paradis as our sentencing submission.[1] For the reasons stated below, we respectfully submit that a sentence of 33 months, to be followed by a period of supervised release that can include his participation in a mental health and drug treatment program, such as one of the two inpatient programs he has already been accepted to, is one that is "sufficient but not greater than necessary" to serve the purposes of sentencing under 18 U.S.C. §3553(a).

  We believe a 33-months' sentence followed by additional treatment as a condition of supervised release would be appropriate given what led to Jahlil's conduct, specifically that he was in a psychotic state at the time. This is the low end of what we believe are the appropriate guidelines in this case. Such a sentence would be sufficient punishment and would also allow Jahlil to (hopefully) be designated to a BOP medical facility where he can receive proper treatment for his diagnosis of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as well as drug

---

[1] We had intended for our client to be able to review our final submission before filing, however when we tried to visit him today at the MDC, we found the doors locked and a sign that said that social and legal visiting had been canceled. While we are not anticipating any amendments to this submission, but we reserve the right to amend and supplement it before sentencing.

treatment. Since he has been detained at the MDC, he has received medication to manage ██ ██████████, but he has received very limited counseling and other necessary treatment.

Such a sentence would also be the longest sentence that Jahlil has ever served and would be an appropriate sentence from the standpoint of deterrence. Although Probation recommends a 60-month sentence, their recommendation is based on an erroneous guidelines calculation which counts Jahlil's youth offender convictions as adult convictions. While we do not intend to minimize Jahlil's prior criminal history, even if he was given YO treatment for all but one of his prior convictions, that conduct stemmed from his participation in a gang that he is no longer part of. Although we recognize that the facts of this case may be independently troubling, in that Jahlil somehow had access to a gun while he was in a psychotic state, we respectfully submit that what he really needs at this point is treatment to help him manage his mental illness and marijuana addiction.

## I. Jahlil's Personal Background Predating the Arrest Conduct

Jahlil was born on December 23, 2000, to Phyllis Parks and James Ford. He has an older half-sister on his father's side, but he is the second to oldest of the five siblings who grew up in his household. His sister Gervasia Ford is 24 years old, Jahlil is 23 years old, his brother Jahlik Ford is 21 years old, his brother ██████████ is 18 years old and his brother ████████ is 15 years old.

Jahlil's parents have never officially married, but they remain together even though they have lived apart at times. He grew up in Section 8 housing at 443 Cyprus Place in the Belmont section of the Bronx, where his parents currently live. Neither of his parents work, but his father receives disability payments because of an accident at the factory where he used to work that damaged his back.

Although Jahlil comes from a loving household, and has the emotional support of his parents, outside indicators suggest that he and his siblings have suffered from some neglect growing up. For example, as noted in Dr. Paradis' report, ACS records indicate that Jahlil was born testing positive for marijuana. His mother admitted to smoking marijuana three times a day while she was pregnant with him. The records indicate that she continued to do so after he was born. In 2007, when Jahlil was approximately six years old, ACS also investigated his mother and father because Jahlil and his siblings were missing too much school. Jahlil also reports that ██ ████████████████████████████████████████████████████████████████████████████████

Notwithstanding the absences, Jahlil loved school and was a strong student in many subjects. In High School, his favorite subject was world history, and he proudly reports that he achieved a 93 on his global history regents exam. He also played football in and out of school (his father was a football coach for the kids in the neighborhood) and was on his High School's chess team. However, growing up in the Belmont section of the Bronx, Jahlil often felt the pull of bad influences in his neighborhood. His friends from when he was young became part of a subsection of the Crips, a dangerous street gang that dominated the neighborhood. Jahlil admits to having been part of this group, and we believe this also speaks to a lack of supervision at home. All of Jahlil's prior criminal history stems from this association. Unfortunately, when Jahlil was arrested at age 18 and sent upstate for a two-year sentence, he dropped out of High School in the 12th

grade. (Since Jahlil was a good student, he had no problem qualifying for his GED while serving his state sentence.)

Jahlil has been inactive in the gang for a number of years. A combination of events led to him deciding to deactivate. For example, when he was in the custody of New York State corrections, he was cut across the face in his sleep by a rival gang member (it has left him with a large permanent scar). A few months later, a 16-year-old friend of his from his neighborhood was shot and killed, presumably he was targeted because of his association with the gang. (Jahlil reports that the murder of his younger friend and other violent incidents left him extremely depressed.)

When Jahlil was released from New York State Corrections in October 2021, he went to stay with his dad who was living in Bridgeport, Connecticut at the time. The impetus for his father living there was to keep Jahlil and his brothers out of their neighborhood in the Bronx so that they would stay out of trouble. However, unable to find work out in Connecticut, and wanting to be close to his girlfriend who lived in his old neighborhood, Jahlil went back to his family home in the Belmont section of the Bronx. It was during this time that Jahlil began exhibiting ███████ ████████████████████ and engaged in the conduct charged in this case.

## II. Circumstances Surrounding the Charged Conduct and Other Procedural Background

Jahlil was arrested on January 24, 2022, over two years ago, and charged in a complaint with violating Section 922(g)(1) for being a felon in possession of a gun and ammunition. These charges relate to Jahlil having discharged a gun in the direction of a moving car on Daly Avenue and East 178th street in the Bronx, and his arrest soon thereafter when he was found with the gun while sleeping in an illegally parked and unlocked car with no license plates on East 181st Street and Clinton Avenue. Unlike his prior arrests, his conduct in this case had no connection to any gang involvement and was clearly the result of a psychotic episode.

We met Jahlil less than 12 hours after his arrest, and it was immediately clear to us that there was something very wrong with him. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

It was so apparent to us that something was not right with Jahlil that we voiced our concerns to the Government on the spot. They told us that the agents who arrested him took him to the hospital (clearly, they too had noticed his bizarre behavior). ████████████████████████████████████████████████████████████████ (*See* attached records.) Jahlil's family and then-girlfriend later told us that they had noticed changes in his behavior on the day of and in the days leading up to his arrest. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

3



The videos produced in discovery corroborate that Jahlil was psychotic that night. Even the circumstances of the arrest conduct were bizarre. Jahlil had no connection to the driver of the car, there was no apparent motivation for the shooting, and no explanation for his finding his way into an abandoned car.

and asked that we seek a court order to have him evaluated for competency.

The BOP transferred Jahlil to FMC Lexington for the evaluation, but prior to that he had begun taking Not surprisingly, when evaluated several weeks later by the BOP's psychiatrist, with the benefit of having been stabilized by medication, Jahlil was found competent to stand trial.

---

[2] Jahlil admits to using marijuana but denies having knowingly used K2 on the date of his arrest. He believes the last time he had used K2 before the night of his arrest was while he was in state custody. Given the facts and how forthcoming Jahlil has been about his other conduct and drug use while incarcerated, we tend to believe him. Dr. Schramm also said that Jahlil told her he had used K2 during interactions with counsel and while housed at the MDC immediately after his arrest. As explained herein,



After his competency evaluation, Jahlil returned to the MDC where he has been since approximately April 2022. We engaged in plea negotiations with the Government prior to indictment and presented to them a request not to prosecute Jahlil based on his having been psychotic at the time of the charged conduct. In forming that proposal, we worked with a court-appointed social worker, Charlotte Erb, LMSW. She identified and helped Jahlil apply to programs that could address ▇▇▇▇▇▇▇ as well as his drug addiction. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Included with this submission is Ms. Erb's description of each of these programs and the services they would be able to offer Jahlil. (We understand from Ms. Erb that these programs would be available to him as part of supervised release once they are able to screen him again.)

In February 2023, the Government rejected our non-prosecution request and indicted Jahlil.

---

Because of this, we submit that it would be unlikely that Jahlil used K2 at that time.

5



We have also noticed drastic changes in Jahlil over the last two years that we have known him. Unlike when we first met him, he is able to look us in the eyes, his voice has inflection, and his face has expression. He is very chatty and able to assist in his defense and answer questions appropriately. In addition to his case, we also talk about the books he is reading (his favorite genre is historical fiction, and more specifically World War II romance novels), his love of football and playing chess (he and another detainee created a chess set out of paper and have set up tournaments within their unit).

Notably, Jahlil has had no disciplinary issues during his time at the MDC, the only "incidents" reported were in the weeks after he was arrested ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and he was found either "not responsible" or "not competent." This is a big change from his disciplinary record while in state custody, and we submit further evidence that Jahlil is no longer engaged in any gang activity.

### III. The Appropriate Guidelines Calculation in this Case

On November 21, 2023, Jahlil pleaded guilty to the charges in the Indictment without a plea agreement. The Government had offered Jahlil a plea agreement with a base offense level of 20 and an additional four-point enhancement for the ammunition having been used in connection with another felony offense (specifically, reckless endangerment). That agreement listed his criminal history as category of III and credited him a three-point reduction for acceptance of responsibility, making those guidelines 46 to 57 months.

However, in order to preserve certain legal issues, Jahlil opted to proceed without a plea agreement. The Government provided a *Pimentel* letter that calculated the guidelines using a cross reference to the attempted murder guidelines. With a criminal history category of III, the guidelines in the *Pimentel* letter are 63 to 78 months.

In its PSR, Probation calculates the guidelines using a base offense level of 24, adds an additional four-point enhancement for the ammunition having been used in connection with another felony offense (they appear to suggest that offense is attempted murder). Probation suggests that Jahlil's criminal history category is V, making their guidelines calculation 100 to 125 months.

For the reasons that follow, we respectfully submit that the guidelines calculations in both the PSR and *Pimentel* letter are in error.

### A. The Court Should Reject the Government's *Pimentel* Letter to the Extent it Applies a Cross-Reference to the Attempted Murder Guidelines

Simply put, the facts of this case do not support the conclusion that Jahlil had a specific intent to kill. Therefore, the attempted murder guidelines suggested in the Government's *Pimentel* letter should not apply. Probation seems to agree with us on this point, but then states that the plus four for the "other felony offense" is because they "believe he committed attempted murder." (*See* PSR at 26.)

The application note to Section 2A2.1(a) indicates that first degree murder is defined by 18 U.S.C. § 1111, which requires "malice aforethought," "poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated killing." All attempted murders require proof of a specific attempt to kill. *See Braxton v. United States*, 500 U.S. 344, n** (1991) ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill.") (internal quotation marks omitted); *United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994) ("Thus, a specific intent to kill is an essential element of the crime for which Kwong was prosecuted. The fact that a deadly weapon was used does not *ipso facto* prove the specific intent.") "To find a person guilty of attempted murder, let alone of attempted murder in the first degree, requires a detailed inquiry into the state of mind and circumstances of a killing, which the casual characterizations of the parties here do not even begin to make possible." *United States v. Jackson*, 351 F. Supp. 2d 108, 114 (S.D.N.Y. 2004).

To apply the attempted murder guidelines, *all* the elements supporting attempted murder, including a specific intent, must be present. *See United States v. Watts*, 519 U.S. 148, 156 (1997); *United States v. Stroman*, 420 F. App'x 100, 105 (2d Cir. 2011) (noting that "to justify imposition of the base level for second-degree murder under section 2A2.1(a)(2) … the district court must have concluded, by a preponderance of the evidence, that Stroman actually attempted or intended to kill his victim"). In *Stroman*, the District Court had applied the attempted murder cross reference based on the reasoning that "You don't run into a bodega, running after somebody, pointing a gun at him and shooting at him, unless this is something you intended to do." 420 F.App'x at 105. The Second Circuit reversed and remanded the case for resentencing concluding that such findings by the district court were not sufficient to apply the cross reference. *Id.* That fact that it "looked like" the defendant "was attempting to kill someone" did not "support a finding of specific intent." *Id*.

Here, the evidence does not support that Jahlil had a specific intent to kill. For starters, as described in detail above, the evidence suggests that Jahlil was psychotic at the time of this conduct, and therefore does not support that he had the requisite specific intent. Moreover, this case lacks other necessary facts that courts have looked at to infer an intent to kill, such as premeditation or shooting at close range (here, the video surveillance shows Jahlil shooting in the direction of a moving car that was many feet – in fact several car lengths – away). *See United States v. Mulder*, 273 F.3d 91, 117 (2d Cir. 2001) (finding intent to kill victim where defendant had threatened to do so and had someone hold victim while he fired many shots actually killing him); *United States v. Ashburn*, No. 11 Cr. 303 NGG, 2015 WL 5098607 at *17 - *18 (E.D.N.Y. Aug. 31, 2015) (autopsy evidence showed bullet wound with black residue inside and outside was consistent with a "contact entrance wound" where muzzle must have been very close to victim's skin). Even if it were "conceivable" or "likely" that Jahlil had such an intent, which we submit it

7

was not, it would not be enough to prove specific intent to kill by a preponderance of the evidence. *See United States v. Williams*, 21 Cr. 491 (JMF) (S.D.N.Y. Aug. 25, 2021) (ECF No. 44 at 9).

Indeed, despite the Government's attempt to make this argument in many felon in possession cases, courts in this District have declined to apply the attempted murder guidelines in cases with facts that were a much closer call than this one. In all of the following cases the defendants successfully and intentionally discharged firearms and, in many of the cases, the intended victims sustained serious injuries as a result, but the Courts found that the cross reference to the attempted murder guidelines did not apply:

- *United States v. Christopher,* 19 Cr. 875 (SHS) (S.D.N.Y. Feb. 13, 2023) (ECF Nos. 201, 202) (despite finding that there was "premeditation" and "planning," Court declined to apply the attempted murder cross reference after trial in case where the two defendants intentionally shot at rival gang members from positions the Government described as "at close range," hitting two of them and injuring a third bystander);

- *United States v. Davila*, 21 Cr. 606 (LJL) (S.D.N.Y Sept. 23, 2022) (ECF No. 34) (Government conceded that attempted murder guidelines did not apply in case where defendant intentionally shot rival drug dealer hitting him in the leg);

- *United States v. Escort*, 21 Cr. 387 (DLC) (S.D.N.Y. Jan. 28, 2022) (ECF. No. 178) (Court declined to apply attempted murder guideline where defendant was convicted at trial of two separate shootings, including one where he fired at his intended victim in the back and another towards people on a crowded street);

- *United States v. Williams*, 21 Cr. 491 (JMF) (S.D.N.Y. Aug. 25, 2021) (ECF No. 44) (Court rejected Government's argument that the attempted murder cross reference applied because it was an intentional and premeditated shooting, where defendant ran after individuals and fired several shots to retaliate for them having pulled a gun on him prior);

- *United States v. Oquendo*, 17 Cr. 611 (AT) (S.D.N.Y. Sept. 1, 2020) (ECF No. 682) (Court rejected cross reference to attempted murder guidelines in case where defendant intentionally shot and injured rival gang member);

- *United States v. Diaz*, 19 Cr. 65 (JMF) (S.D.N.Y. Aug. 26, 2019) (ECF No. 24) (declining to apply attempted murder cross reference in possession of ammunition case, noting that "intent is obviously a difficult thing to prove");

- *United States v. Jackson*, 351 F. Supp. 2d 108, 114 (S.D.N.Y. 2004) (Court did not apply §2A2.1(a)(1) in sentencing defendant who had repeatedly fired machine gun in a shootout where at least one person was seriously injured, even where parties had originally stipulated that the guideline applied).

Here, the Government ignores Jahlil's mental state and the specific intent required, and instead states in a conclusory fashion that the cross reference should apply because this shooting was at "close range." We respectfully submit that the evidence in this case does not support such a finding, and indeed the surveillance videos show that the car was moving and at all times multiple

8

feet away. Moreover, the shooting in this case was no more at "close range" than any of the above cited felon in possession shooting cases where courts rejected the Government's argument that this cross reference should apply. For example, in *United States v. Escort*, Judge Cote declined to apply the attempted murder guidelines in a felon in possession case where the defendant, who was close enough to have just engaged in a verbal argument with the victim, fired five shots at the victim's back as he turned around to walk away. (ECF. No. 178 at 7.) Judge Cote rejected the Government's argument that the Court could infer intent because that shooting was similar to other "close range" cases and because, after having left the area, the defendant "calmly" returned to the scene and fired shots a second time. (*Id.*) If the attempted murder guidelines could not be applied in these other cases, they clearly should not and cannot be applied here.

### B. Probation Erroneously Counts Jahlil's Prior Youth Offender Convictions in his Criminal History and Base Level Offense Calculations

Probation's use of Jahlil's prior convictions for which he was adjudicated as a juvenile offender under New York State law in their criminal history and base offense level calculations is an error. We note that the Government was fully aware of Jahlil's prior criminal history and has conceded that the youthful offender convictions should not be counted. This is why in their *Pimentel* letter, and in the extended plea offer, they calculated his base offense level as 20 and his criminal history to be category III.[3] Also, with less than seven criminal history points, there should be no additional point added for being on parole at the time of the instant offense. *See* U.S.S.G. § 4A1.1(e).

Under Section 2K2.1, the term "felony conviction" means "a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed. A conviction for an offense committed at age eighteen years or older is an adult conviction. A conviction for an offense committed prior to age eighteen years is an adult conviction if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted."

To determine whether Jahlil's convictions when he was under 18 years old can be treated as adult convictions for purposes of calculating his guidelines, the Court must focus on the substance and nature of that proceeding, and the sentence received, including where that sentence was served. *United States v. Cuello*, 357 F. 3d 162, 168 -169 (2d. Cir. 2004). In *Cuello*, the Second Circuit held that the district court had not erred in finding that the defendant's previous convictions from before he was 18 could be counted as adult convictions because he had been "indisputably tried and convicted in an adult forum, and […] defendant served his sentence in an adult prison[.]"

---

[3] The Government does include an April 12, 2019 misdemeanor conviction for criminal possession of stolen property for which we believe Jahlil was also adjudicated as a "youthful offender" but is mislabeled in his criminal history reports. Among other things, Jahlil was sentenced by the same court on the same day for two other cases where he was given YO treatment, and he maintains that he was given YO treatment for these consolidated cases.

9

Jahlil has only one previous felony conviction for which he was treated as an adult. He has two other sets of convictions that predate his 18th birthday. Although Probation points out that the other cases when he was 16 and 17 years old were not handled in family court and the punishment was at a "secured facility," neither of these facts in and of themselves make it "indisputable" that these were adult convictions. For each of those cases, he was sentenced to concurrent time and was adjudicated as a "youthful offender" in a specific youth part in Bronx County, which is not the same as an "adult forum." He was then designated to the Horizon Juvenile Center, a youth detention facility operated by the Administration for Children's Services, to serve his sentences. (*See* attached printout from the ACS website, also available at https://www.nyc.gov/site/acs/justice/secure-detention.page.) Characterizing the Horizon Juvenile Center as an "adult prison" is clearly disputable. For these reasons, counting these convictions as adult convictions for purposes of the base level offense and his criminal history would be in error.

### C. The Base Level Offense Should be 18 and There Should be No Additional Enhancement for "Another Felony Offense"

The Government's basis for calculating the base offense level for the Section 922(g) charges at 20 is that they count his one adult conviction for attempted robbery in the second degree as a "crime of violence." However, we submit that Jahlil's base offense level should be an 18 since, under New York state law, attempted robbery in the second degree is not a crime of violence since it does not have "as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1). Under N.Y. Penal Law § 110.00, "[a] person is guilty of an attempt" under New York law "when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." The intent to rob is just a mental state and thus entails no "use, attempted use, or threatened use of physical force." U.S.S.G. § 4B1.2(a)(1). And though the "conduct which tends to effect" a robbery "must 'carry the project forward within dangerous proximity to the criminal end,'" *People v. Bracey*, 41 N.Y.2d 296, 300 (1977) (citation omitted), "New York's 'dangerous proximity' requirement is virtually identical to the federal requirement that a defendant must take a 'substantial step.'" *United States v. Celaj*, 649 F.3d 162, 170 (2d Cir. 2011). Indeed, "the distinction between the federal and state requirements is 'more semantic than real.'" *Id.* at 170-71 (citation omitted). In any event, New York's highest court has made clear that attempted robbery can be committed without the "use, attempted use, or threatened use of physical force." U.S.S.G. § 4B.12(a)(1).

We also object to the four-point enhancement on account of the ammunition and firearm having been possessed in connection with another felony offense. The application notes explain that, under this section, "another felony offense" means "any federal, state, or local offense, *other than the explosive or firearms possession or trafficking offense*, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." (Emphasis added.)

Probation alleges that the other felony offense was "attempted murder," (PSR at 26), but as we describe above the facts do support such a finding by a preponderance of the evidence. Courts have declined to apply the four-level enhancement even where the crux of the Government's case was that the defendant committed the possession of a gun or ammunition by engaging in an actual shooting. *See, e.g., United States v. Falu*, 21 Cr. 44 (JPO) (S.D.N.Y. Apr. 12, 2022) (sentencing minutes attached); *United States v. Williams*, 21 Cr. 491(JMF) (S.D.N.Y.

10

Aug. 25, 2021) (ECF No. 44) (declining to apply any additional enhancement in case where ammunition was used in connection with a shooting with no injured victims). While a Section 922(g) charge may be a "general" intent crime, it is not clear that there is any additional felony offense here for which Jahlil could have had a specific intent given his psychotic mental state. For example, under New York law, even the charge of felony reckless endangerment that the Government had suggested could be the "other felony offense" in their plea agreement requires that a person understands the consequences of his or her actions. *See People v. Feingold*, 7 N.Y.3d 288, 295-296 (2006).

Accordingly, we respectfully submit that the appropriate base level offense here should be 18 without the "other felony offense" enhancement. With a criminal history category of III, the guidelines should be 33 to 41 months.

### IV. Jahlil Should be Granted a More Lenient Sentence in Light of the Harsh Conditions he has Endured at the MDC

While this is not Jahlil's first time being incarcerated, it has been by far the hardest. He has been at the MDC for the better part of two years, and as Your Honor is undoubtedly aware, the conditions there, which became even more deplorable during the pandemic, have remained well below their already inhumane standards. To this day, the MDC often keeps detainees locked in their cells, sometimes more than 23 hours a day, several days in a row. Such "lockdowns" happen regularly but they have become routine on the weekends and holidays (the MDC blames it on being short staffed). For example, the entire facility was on a lockdown between December 20th and January 3rd, and then again from Friday January 5th to Monday January 8th (detainees were allowed to come out only to retrieve their trays of food and then told to go back to their cells). And there have been several lockdowns in the weeks since. The lockdowns give detainees no opportunity to shower, call loved ones or have any recreation. As a result, even those housed in the regular units are punished as if they are in solitary confinement. Among other things, the MDC also frequently fails to provide needed medical care, clean and sanitary conditions, hot food, and at times will neglect to provide any food for a meal altogether. We respectfully submit that the Court should take into consideration how extra punishing Jahlil's time at the MDC has been, and that in and of itself should be a basis for providing a more lenient sentence.

### V. Jahlil's Plans for the Future

Although we appreciate that the Court cannot ignore Jahlil's prior criminal history, we respectfully submit that a sentence here should be fashioned to address the circumstances of Jahlil's conduct, and by that we mean his ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. To this end, we ask that the Court recommend that Jahlil be placed at a medical facility within the BOP. We further submit that, given all of these facts, a sentence of 33 months, to be followed by a term of supervised release with a condition that Jahlil continue with ▓▓▓▓▓▓▓▓ and drug treatment (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, would be sufficient but not greater than necessary. Jahlil will need to learn to live with ▓▓▓▓▓▓▓▓▓▓, and we are hopeful for his future. His parents are currently looking to relocate out of the Bronx (specifically to New Jersey) to create a better life for their family. Jahlil expressed to Probation that he is interested in pursuing a career as an

electrician to assist one of his sisters who works as a realtor fixing and flipping houses. Given how bright Jahlil is, we have no doubt that he can achieve this and much more.

                                                          Respectfully submitted,

                                                          *Sarah M. Sacks*